# Privol's Appeal

*John M. Walker*, for Commonwealth; *Eugene A. Caputo*, for appellant.

McConnel, J., March 2, 1934.—This is an appeal by Anna Privol from the refusal of the Pennsylvania Liquor Control Board to grant her a license for the sale of liquor at a restaurant called Privol's Oyster House, at no. 290 Fourth Street in the Borough of Ambridge, in this county, and the appeal is taken by her under section 404 of the Pennsylvania Liquor Control Act of November 29, 1933, P. L. —, which is as follows:

"Any person aggrieved by the refusal of the board to issue a hotel, restaurant or club liquor license may appeal to the court of quarter sessions of the county in which the hotel, restaurant or club is located. Such appeal shall be upon petition of the applicant, who shall serve a copy thereof upon the board, whereupon a hearing shall be held upon the petition by the court upon ten days' notice to the board, which shall be represented in the proceeding by the Department of Justice. At such hearing testimony may be presented by the applicant and the board, after the consideration of which the court shall either sustain the refusal of the board or order the issuance of the license to the applicant. There shall be no further appeal."

The appeal was filed in the court of quarter sessions of this county on January 26, 1934. The matter was heard before the court in banc on February 10, 1934, at which time a full hearing was had and testimony received on the part of the appellant and the Department of Justice of the Commonwealth.

At the time of the hearing, counsel for the Department of Justice took the position that under the Liquor Control Act of 1933 the court could not hear the case de novo but could only determine whether the Liquor Control Board had abused its discretion in refusing to grant the license to the appellant, and coun-

sel for appellant contended that the court, under this act of assembly, was required to hear the case anew and decide it upon the evidence produced at the hearing. Counsel for the Department of Justice insisted also that the real applicant for the license was not Anna Privol but her husband, Sam Privol, and that no license ought to be granted to Privol's Oyster House because it was reputed to have been a speakeasy for several years, and because Sam Privol himself had been convicted of a violation of the Snyder Act in 1929 and was an unfit person to have a restaurant license.

We really have two questions to determine: First, whether the court, under the Liquor Control Act, is required, upon an appeal, to hear the case de novo, or is limited merely to the record and the question of abuse of discretion by the Liquor Control Board; second, whether under the evidence produced at the hearing in court a restaurant license ought to be granted to Anna Privol, or whether it should be refused.

As to the first question, we are satisfied that the Liquor Control Act contemplates a hearing by the court de novo upon all appeals from the refusal of the Liquor Control Board to grant licenses.

. It will be noticed that under section 404 of the act the judgment of the Liquor Control Board is to be reviewed upon appeal to the court of quarter sessions of the county in which the hotel, restaurant, or club is located; that after the filing of the appeal a hearing should be held by the court upon 10 days' notice to the board; and that at such hearing testimony may be presented by the applicant and the board, and after consideration of the testimony the court shall either sustain the refusal of the board or order the issuance of the license applied for. The act, then, calls the writ by which the judgment of the Liquor Control Board is to be reviewed by the court of quarter sessions an appeal and also provides for a hearing, and it seems to us it necessarily follows from these provisions that the case must be heard, upon appeal, by the court de novo.

The word "appeal", as distinguished from a certiorari or writ of error, has a well-defined meaning, and the difference between these writs is expressed in 3 C. J. 299, sec. 2, thus:

"By the English common law the judgments of the court of common pleas and of all inferior courts were brought under the review of the court of king's bench, for revision and correction, by writ of error, writ of certiorari, or writ of false judgment. The remedy by appeal, which was unknown to the common law, was employed for the review of causes in equity, ecclesiastical, and admiralty jurisdictions."

And in note 8 under this citation it is said that the writ of error was the remedy to review judgments of the common pleas or other inferior courts of record, when the proceedings were according to the course of common law; the writ of certiorari was the remedy to review judgments of inferior courts when the proceedings were summary or different from the course established by the common law; and the writ of false judgment was the remedy to review judgments of county courts, courts baron, and other inferior courts not of record. In 3 C. J. 314, sec. 28, "appeal" is defined as follows:

"The term is sometimes used to denote the nature of the appellate jurisdiction, without regard to the particular mode by which a cause is transmitted from one tribunal to another; but, in its original and strictly technical sense, an appeal was a proceeding, introduced into equity practice from the civil law, by which the whole cause was removed from a lower to an appellate court, and there tried de novo upon evidence newly introduced, being subjected to a new and final determination as if it had not been tried before, and without any reference to the conclusion of the inferior court."

See also 1 Words and Phrases 445, "Trial de novo authorized". And with regard to the meaning of appeal, our Supreme Court, in Springer's Admrs. v. Springer et al., 43 Pa. 518, 519, said:

"It is by *appeal* that equity remedies are reviewed in a higher court, and that brings up the whole case, and not merely the record of it."

Originally and technically, then, when an appeal was allowed from one court to another the case was to be heard anew, as in appeals to the quarter sessions court under the Act of April 17, 1876, P. L. 29, sec. 1, from summary convictions, and appeals to the common pleas under the Act of March 20, 1810, 5 Sm. Laws 161, sec. 4, from the decision of a justice of the peace in civil cases. But in this Commonwealth the word "appeal" has to a great extent lost its technical meaning, especially since the passage of the Act of May 9, 1889, P. L. 158, under the terms of which all appellate proceedings in the Supreme Court are taken by appeal instead of by writ of error, appeal, or certiorari, as theretofore. And now when an appeal is allowed from an inferior court to a superior one, whether the case appealed is to be heard de novo or not is to be determined by an examination of the act of assembly allowing the appeal.

Thus the Act of May 15, 1915, P. L. 534, allowing an appeal to the court of common pleas from a decision of the Pennsylvania State Board of Censors of moving picture films was held by the Court of Common Pleas of Philadelphia to require the court to hear the case de novo and examine the films rejected by the Board of Censors. But the Supreme Court, in the case of In re The Franklin Film Mfg. Corp., 253 Pa. 422, reversed the lower court and decided that the court of common pleas upon appeal is only to determine whether the censors have abused their discretion. Mr. Justice von Moschzisker, in delivering the opinion of the court, said (p. 426):

"At the present time, in our law, the word 'appeal' has no conclusive meaning, for, since the Act of May 9, 1889, P. L. 158, a writ of error and a certiorari, as well as an appeal proper, are all designated 'appeals' (Diamond St. [196 Pa. 254], supra) ; therefore, it is necessary in each instance to look at the particular act of assembly giving the right of appeal to determine just what powers are to be exercised by the appellate court. In this connection, a careful reading of the statute here in question convinces us it was never contemplated that the Courts of Common Pleas were to be constantly called upon to permit moving picture reels to be reproduced before them, and sit as supercensors thereof, in order to review the decisions of the administrative body created by the act. The evident intent was to grant a right of appeal to the Common Pleas so that tribunal could correct any arbitrary or oppressive orders which the board of censors might make, and nothing more; in other words, that the court might reverse the censors when the latter were guilty of an abuse of discretion. This is the ordinary rule to which, on appeal, even this court restricts itself in reviewing an exercise of discretion, particularly of administrative officials."

The same justice, in the case of McCauley v. Imperial Woolen Co. et al., 261 Pa. 312, in passing upon the duties of a court of common pleas, upon the appeal to that tribunal from a decision of the Workmen's Compensation Board under the Compensation Act of 1915, held that upon appeal the controversy was not to be heard de novo by the court below but the facts found by the board, if there was evidence to support them, were to be accepted as true by the court of common pleas, and quoted what had been said by the court in the Franklin Film Manufacturing Corporation case hereinabove recited, that it is necessary in each instance to look at the particular act of assembly giving the right of appeal to determine just what powers are to be exercised by the appellate court.

We can take this, then, as the established law in this Commonwealth, that

wherever an appeal is allowed from an inferior court to a higher one, whether the case is to be heard de novo or not is to be determined by an examination of the particular act of assembly, and an examination of the Act of 1933 satisfies us that what the State Legislature intended when it granted an appeal to the quarter sessions from the refusal of the Liquor Control Board to grant a license was that the court of quarter sessions should hear the case de novo, because the act not only provides for the appeal but for a hearing before the court upon 10 days' notice to the board, and that at such hearing testimony may be presented by both the appellant and the board, and the act specifically says that after consideration of this testimony the court shall sustain the refusal of the board or order the issuance of the license to the applicant. The only meaning which can be taken from these words is that the court is to decide the case under the evidence produced before it and enter judgment upon that evidence without any reference to the decision of the Liquor Control Board.

Therefore, we are satisfied that under section 404 of the Liquor Control Act of 1933 we must hear and determine the application for a license made by Anna Privol as though it had not been passed upon by the Liquor Control Board.

We must then determine the second question—whether under the application made by her and under the testimony produced in court she is entitled to have a license.

This act of assembly is to be liberally construed, as stated in section 3 thereof, "for the protection of the public welfare, health, peace and morals of the people of the Commonwealth, and to prohibit forever the open saloon", and the two primary objects the legislature wanted to accomplish were to get rid of the "speakeasy" and of the saloon. The method evidently adopted to accomplish their purpose was to confine the sale of intoxicating liquors to bona fide hotels, restaurants, and clubs, and we must construe the act so as to accomplish this purpose, not necessarily by limiting the number of licenses, but by strictly confining them to legitimate eating places.

We deem it our duty to see that the applicant is not only conducting a bona fide eating place but that he is a fit person to conduct a restaurant and that he has complied with the terms of the act of assembly and the rules and regulations of the board in making his application.

Under section 2 of the act, a restaurant is defined as follows:

" 'Restaurant' shall mean a reputable place, operated by responsible persons of good reputation, and habitually and principally used for the purpose of providing meals for the public."

An examination of the testimony in this case shows that the restaurant for which the application was made is not a reputable place and it is not habitually and principally used for the purpose of providing meals for the public. In addition to that, the application is filled with the baldest kind of misstatements and falsehoods, so that we could not under any circumstances grant this application, even if it were a reputable place and a place which was habitually and principally used for the purpose of providing meals for the public, which it evidently is not.

In paragraph 1 of the application, Anna Privol says that she has lived in Ambridge, at 247 Maplewood Avenue, for 4 years; on page 16 of the testimony she admits that she has not lived in Ambridge for 4 years, and on page 18 she says she came to Ambridge first after she was married, August 2, 1933, and never lived on Maplewood Avenue. In paragraph 2 of the application, she also says that the manager, who is herself, has lived at 247 Maplewood Avenue, Ambridge, for 4 years; and on page 17 of her testimony she says that she has only lived there 1 year, and on page 18 she says she never lived on Maplewood

Avenue at all. In the third paragragh of the application, she says that in Privol's Oyster House are ten tables. In her testimony, page 4, she says there are not ten tables, but eight booths and five tables, and on page 14 she says there are only four tables. In the same paragraph of the application, she says five persons are regularly employed in the preparation of meals or work incidental thereto in the kitchen of this restaurant; on page 4 of her testimony she says there are only four people employed; on page 9 she says that the restaurant is now closed and that they intend to open it if they get a license; on page 14 of her testimony she says there are no cooks or waitresses employed in the restaurant at the present time and that there have not been since December 15, 1933, and on page 24, having testified that the reason the restaurant was not open was because they started remodeling it about December 5th, she says that the remodeling has been completed for over a month, but they have not yet opened it as a restaurant but are waiting for a license. In paragraph 5 of her application, she says that she has been a resident of the Commonwealth of Pennsylvania for 28 years, and on pages 3 and 4 of her testimony she admits that she has only been in the Commonwealth of Pennsylvania for 7 years. In paragraph 13, she says she has conducted the restaurant business for 5 years, and in her testimony, page 4, she admits that she has only operated the restaurant in question for 6 months, or since her marriage in August. On page 8, she says she worked in Pittsburgh until she was married on August 2, 1933. In paragraph 14, she says a restaurant has been conducted on the premises in question for 5 years, but on page 15 of her testimony she says she does not know how long a restaurant has been conducted there, and she says the same on page 20 of the testimony. On page 55, she says that Sam Privol operated a restaurant prior to their marriage at 290 Fourth Street, Ambridge, the premises in question in this case.

In addition to these defects in the application, we are not satisfied that the applicant is the owner of the restaurant for which the license is asked. On page 5 of her testimony, Anna Privol says that Sam Privol operates the restaurant at 290 Fourth Street, which is the place where the license is asked for; on page 8, she says Sam Privol helps around the restaurant the same as she does; and on page 11 of her testimony she says that she has no arrangement with Sam Privol to pay him any wages or salary or compensation of any kind, but he gets whatever they make in operating the restaurant. On December 16, 1933, when John J. Shaup, a member of the State Constabulary, visited this restaurant, he found Sam Privol there, and he said that he was in charge of the restaurant.

This application is made in the name of Anna Privol merely to escape from the reputation of Sam Privol, who seems to have operated a restaurant at the place where the license is asked for during a number of years prior to 1933. In 1929, he was convicted in the court of quarter sessions of this county of a violation of the Snyder Act, and on March 29, 1930, was placed on probation for 3 years, on condition that he pay the costs of prosecution, the sum of $500 to Beaver County in the nature of a fine, and that he remove from the State of Pennsylvania and remain out of the State during the term of his probation. So, if he complied with this order of the court, he could not have been a resident of the Borough of Ambridge or of this Commonwealth except since March 29, 1933.

The act of assembly requires that the restaurant shall be a place of good reputation and operated by responsible persons of good reputation, but John M. Breen, a witness called by counsel for applicant, admits on page 30 of the testimony that the restaurant of Sam Privol, or Privol's Oyster House, for which

the application is made, has been known as a speakeasy, and that means, of course, that the reputation of the place is not good. Therefore, we are satisfied that this application for a license ought to be refused.

### Order

Now, March 2, 1934, the refusal of the Liquor Control Board to grant the application of Anna Privol for a restaurant license is sustained, and the appeal is dismissed at the costs of the appellant.